# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3189 | **DATE** | 4/23/2002 |
| **CASE TITLE** | Shannon Burling vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Plaintiff Shannon Burling's motion for summary judgment [17-1] and motion for remand for consideration of new and material evidence [18-1] are denied. Defendant Jo Anne B. Barnhart's motion for summary judgment [29-1] is granted. The Commissioner's final decision is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | 2 | |
| ✓ | Notices mailed by judge's staff. | | number of notices | |
| | Notified counsel by telephone. | | APR 2 4 2002 | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 33 |
| | Copy to judge/magistrate judge. | | 4/23/2002 | |
| | | U.S. DISTRICT COURT | date mailed notice | |
| IS | courtroom deputy's initials | | IS | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

APR 2 4 2002

SHANNON BURLING, a minor, by her mother )
and next friend, Patricia Burling, )
)
               Plaintiff, )     Case No. 01 C 3189
)
        v. )     Magistrate Judge
)      Martin C. Ashman
JO ANNE B. BARNHART, )
Commissioner of Social Security,[1] )
)
          Defendant. )

## MEMORANDUM OPINION AND ORDER

      Shannon Burling, by her mother and next friend, Patricia Burling ("Ms. Burling"), seeks

judicial review of the Commissioner's final decision denying Shannon's application for

Supplemental Security Income ("SSI"). Shannon moves this Court to set aside the

Administrative Law Judge's (the "ALJ") decision because of a change in the law, because the

Appeals Council committed an error of law when deciding whether to grant full review, and

because of additional evidence submitted to this Court pursuant to 42 U.S.C. § 405(g). In

addition, Shannon contends that the ALJ erred by ignoring certain evidence and by failing to

discuss specific listings. Lastly, Shannon claims that substantial evidence does not support the

ALJ's findings that Shannon did not meet Section 112.02 or Section 112.11 of the Listing of

Impairments. For the reasons set forth below, this Court denies Shannon's Motion for Summary

---

     [1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Jo Anne B. Barnhart is
automatically substituted as defendant in place of Larry Massanari, the original defendant in this
case.



Judgment and Shannon's Motion for Remand pursuant to 42 U.S.C. § 405(g). The Commissioner's final decision is affirmed.[2]

## I. **Procedural Background**

On July 31, 1997, Ms. Burling applied for SSI on behalf of Shannon, alleging that Shannon was disabled as of July 1, 1996, due to asthma and impairments caused by developmental delays. (R. at 80-92.) The Social Security Administration denied Shannon's application initially and upon reconsideration. (R. at 93, 100-02, 105, 110-13.) Shannon requested review of the decision before an administrative law judge. (R. at 114.) On August 19, 1999, the ALJ held a hearing, eliciting testimony from Shannon and Ms. Burling, who appeared with counsel, and Dr. William Fischer, a medical expert. (R. at 46-47.) In a written decision, dated September 21, 1999, the ALJ found Shannon not disabled based on the testimony and the medical evidence. (R. at 30-31.)

On November 15, 1999, Shannon requested that the Appeals Council review the ALJ's decision. (R. at 15.) After making the request, Shannon submitted additional evidence for the Appeals Council to consider. On March 8, 2001, the Appeals Council denied Shannon's request for review, indicating that it "considered" the additional evidence but found that the additional evidence did not provide a basis for changing the ALJ's decision. (R. at 4.) The ALJ's decision thereby became the final decision of the Commissioner. 20 C.F.R. § 416.1481. Shannon now seeks judicial review of that decision pursuant to 42 U.S.C. § 1383(c)(3).

---

[2] The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

## II.    Factual Background

### A.    Shannon's and Ms. Burling's Testimony

Shannon was born on July 1, 1993, making her six years old at the time of the hearing. (R. at 80.) She lived with her sister and Ms. Burling—Shannon's grandmother and adoptive parent. Shannon attended Kindergarten.

Shannon was exposed to cocaine and heroin *in utero*. (R. at 192-93.) This likely was the cause of certain developmental delays. For instance, Shannon began walking around nineteen months of age, speaking her first intelligible words at twenty-five months of age, and autonomously using the toilet at four years of age. (R. at 200.) Early in life, Shannon had right-side weakness in her upper and lower extremities. (R. at 202.)

Ms. Burling stated that Shannon experienced much difficulty in Kindergarten because she "did not understand the work." (R. at 51.) Shannon was unable to count, recite the alphabet, color, write numbers, and spell words like the other children. (R. at 51-52, 250-51.) Shannon's teacher commented that Shannon worked below grade level, and, upon completion of the school year, Shannon's teacher decided that Shannon would need to repeat Kindergarten. (R. at 249, 273.) Despite the circumstances, Shannon stated that she liked school. (R. at 54.) She had friends there. (R. at 53, 249.)

At the time of the hearing, Ms. Burling believed that Shannon's asthma was "doing pretty good." (R. at 59.) To treat the asthma, Shannon used a nose spray and an inhaler. (R. at 59.) Shannon has never been admitted to a hospital because of her asthma. (R. at 59.)

Shannon said that she enjoyed taking dance lessons and playing house and dress-up with her sister. (R. at 52, 62.) Shannon knew her left from her right, knew that she would have to

retake Kindergarten, knew her teacher's name, and knew that she lived close to school. (R. at 53-54, 57-58.) However, Shannon stated that she could not count to ten, could not spell her name, and could not remember her telephone number. (R. at 63.) Further, Shannon testified that she could not dress herself and that she received help from Ms. Burling to do "all things." (R. at 55.) Ms. Burling commented that she had to constantly watch Shannon because she had a tendency to wander off. (R. at 56.) She also stated that Shannon often argued with her sister. (R. at 60.)

Since 1999 Ms. Burling has taken Shannon to Aunt Martha's Youth Service Center for counseling. (R. at 60.) In 1999, Ms. Burling enrolled Shannon in special education classes. (R. at 58.) Such services were not immediately available to Shannon upon her move to Aurora in October 1998. (R. at 58-59.)

### B.    Medical Evidence

On January 29, 1997, a social worker, psychologist, and speech-language pathologist examined Shannon's development. The examiners noted that Shannon's attention and concentration varied during the examination, on occasion they had to make requests several times. (R. at 174.) Testing on the Stanford Binet Intelligence Scale revealed an I.Q. of seventy-eight, which placed Shannon within the borderline range. (R. at 174.) A Peabody Picture Vocabulary Test-Revised indicated that Shannon was within the low average range with a standard score of eighty-four and a percentile rank of fourteen. (R. at 175.) Shannon's receptive language skills were within the lowest limits of the low average range with a percentile rank of nine according to the auditory comprehension section of the Preschool Language Scale-3, and

Shannon's expressive language skills equated to a percentile rank of one according to the Expressive One-Word Picture Vocabulary Test-Revised. (R. at 175.) Testing under the expressive communication section of the Preschool Language Scale-3 placed Shannon within the low average range, while testing under the Bankson-Bernthal Quick Screen of Phonology placed Shannon within the third percentile with a standard score of seventy-one. (R. at 175-76.) Overall, the examiners concluded that Shannon had borderline to low average abilities. They warned that Shannon was at risk for learning disabilities. (R. at 176.)

Nine months later, Dr. Abayomi Akintorin evaluated Shannon. He noted that Shannon had been diagnosed with developmental delays and asthma. (R. at 193.) At the examination, Shannon exhibited good air entry in her lungs with no wheezing, full range of motion in her extremities but with diminished power in her right upper and lower extremities, and the ability to grasp and manipulate with either hand. (R. at 195-96.) Neurological signs were normal—no motor, sensory, or cerebellar abnormalities were noted. (R. at 196.) Shannon was alert, responsive, and capable of following instructions, although she was somewhat easily distracted. (R. at 196.) Shannon failed the majority of tasks expected for someone of her age in the gross motor, language, and personal-social sections of a Denver Developmental Screening Test. (R. at 196.) However, she "passed well" the fine motor adaptive section of the test. (R. at 196.) Dr. Akintorin's impressions were developmental delay, weakness of the right upper and lower extremities, and bronchial asthma. (R. at 196.)

Dr. Mark Langgut conducted a psychological assessment of Shannon in November 1997. He noted that Shannon had several neighborhood friends and friends at school with whom she socialized. (R. at 200.) Shannon's gait appeared unimpaired. (R. at 200.) Reportedly,

Shannon's right-side motor defects were largely corrected. (R. at 200.) During the formal examination, Shannon was quiet, focused, and appropriately interactive, while before the exam Shannon's interactions with her sister were "chaotic and cacophonous." (R. at 200.) In general, Shannon was emotionally appropriate and exhibited no signs of abnormal behavior. (R. at 201.)

Shannon earned a General Cognitive Index of eighty-two on the McCarthy Scales of Children's Abilities, which suggested functioning at the dull normal level of intelligence compared to other children of similar age. (R. at 201.) Her verbal score revealed that she was below average in her ability to express herself, while her quantitative score revealed that she was only somewhat below the mean in her facility with numbers and her understanding of quantitative words. (R. at 201.) Dr. Langgut remarked that Shannon appeared to have lingering developmental delays, but that she had made progress in various areas. (R. at 201.)

On March 27, 1998, Dr. Debra Fiali conducted a Pediatric Consultative Examination. Dr. Fiali indicated that Shannon was not enrolled in special education classes at the time, but that she was on the list for speech therapy. (R. at 203.) According to Ms. Burling, Shannon had wheezing and coughing symptoms on a nightly basis and during the day after running around outside. (R. at 203.) Prior to the exam, Shannon and her sister made a great deal of noise, but during the exam Shannon was cooperative and able to fully participate, occasionally needing a reminder to stay on task. (R. at 203.) Shannon's lungs were clear with good aeration. (R. at 203.) Her gait was normal. (R. at 204.) Her speech was about seventy-five percent understandable, and she responded to normal spoken voice. (R. at 204.) Dr. Fiali did not notice any motor, sensory, or cerebellar abnormalities, but observed that Shannon had decreased ability isolating her fingers for rapid movements. (R. at 204.) Although Shannon had a history of

right-side weakness, Dr. Fiali found Shannon to be neurologically intact and without objective weakness on the right side. (R. at 204.) Shannon took a Denver Developmental Screening Test that was suspect with multiple age delays and cautions in the personal-social area. She did have age appropriate gross motor, language, and fine motor adaptive skills. (R. at 204.)

On October 27, 1998, Shannon underwent a electroencephalogram. Dr. Guillerno Philipps interpreted the test as "[m]ildly abnormal . . . due to the presence of the mildly diffused slowing of the background rhythm, compatible with encephalopathy." (R. at 219.)

In early 1999, the Aurora school district determined that Shannon was eligible for placement into special education programs at her school. Shannon's voice and fluency were appropriate for her age, and her receptive and expressive vocabulary skills were in the average range. (R. at 226.) However, she had a composite score I.Q. of eighty-nine according to the Stanford Binet Intelligence Scale. (R. at 240.) Around May 1999, Shannon began taking Ritalin to help Shannon focus and concentrate at one task at a time. (R. at 64, 267.) In May 1999, Shannon's teacher commented that Shannon had a short attention span and poor concentration skills. (R. at 249.)

### C.     Medical Expert

Dr. Fischer testified last at the hearing. Based on the evidence, Dr. Fischer concluded that Shannon had two severe impairments: developmental delays and asthma. (R. at 65.) He noted that Shannon was prescribed Ritalin, which he presumed was prescribed to treat hyperactivity, but he remarked that there was no diagnosis of attention deficit hyperactivity disorder ("ADHD"). (R. at 65-66.) Dr. Fischer also concluded that, based on his review of the

- 7 -

evidence, his observations at the hearing, and the testimony presented at the hearing, Shannon did not have an impairment or combination of impairments that met, equaled, or functionally equaled any of the listings. (R. at 66.)

In terms of personal functioning (i.e., self-care) and concentration, persistence, or pace, Dr. Fischer found that Shannon had significant problems, but not ones that were markedly limiting. (R. at 66-67.) With respect to cognitive and communicative development, Dr. Fischer found that Shannon's limitations were less than marked. (R. at 67-68.) He explained that Shannon's I.Q. scores placed her in the low average range but that she was not mentally retarded. (R. at 67.) The problem was that Shannon was not achieving up to the low average level, and her current school placement was not helping the situation. (R. at 67.) Dr. Fischer also pointed out that Shannon's receptive and expressive language skills were average. (R. at 68.)

Dr. Fischer determined that Shannon's motor skill limitations were less than marked. She still had some right-side weakness and some limitations emanating from her asthma, but she functioned adequately. (R. at 68.) Lastly, in terms of social functioning, Dr. Fischer opined that Shannon's limitations were less than marked. Shannon was a bit immature and dependent, and at times "a little feisty." (R. at 68.)

In response to a question asked by Shannon's counsel, Dr. Fischer stated that Shannon's cognitive development would be markedly limited if her achievement levels were two standard deviations below her I.Q. scores—he estimated that presently they were only about one. (R. at 72-73.) Upon further questioning, Dr. Fischer iterated that there was no diagnosis of ADHD in the record, but that it was possible that Shannon had the condition. (R. at 74.)

## III.    The ALJ's Decision

In light of the above, the ALJ determined that Shannon was not disabled at step three of the three-step sequential analysis required under the Social Security Act. *See* 20 C.F.R. § 416.924 (1998). First, the ALJ found that Shannon was not engaged in substantial gainful activity because she had never worked. (R. at 23.) Next, the ALJ determined that Shannon was severely impaired by a learning disability and asthma because each of the impairments had more than a minimal impact on Shannon's functioning. (R. at 24.) Third, the ALJ found that Shannon's learning disability and asthma did not meet, medically equal, or functionally equal an impairment listed in the Listing of Impairments, and therefore, Shannon was not disabled. (R. at 25-30.)

In determining that the severity of Shannon's impairments did not meet or medically equal the severity of a listed impairment, the ALJ considered the testimony of Shannon and Ms. Burling and he relied on the opinions of Drs. Pilapil, Hermsmeyer, Rains, and Fischer as well as those of the medical and psychological consultants who reviewed the record. (R. at 25.) Dr. Fischer's testimony, in particular, was deemed to be fully credible and persuasive. (R. at 25.) In determining that Shannon's impairments did not functionally equal an impairment listed in the Listing of Impairments, the ALJ considered the above-referenced evidence in light of 20 C.F.R. § 416.926a (1998). The ALJ held that Shannon experienced limitations in the categories of cognitive and communicative functioning, social development, motor functioning, personal functioning, and the ability to maintain concentration, persistence, or pace, but to less than a marked degree. (R. at 26-29.) Shannon's most recent I.Q. score was eighty-nine. She showed age appropriate voice and fluency and average receptive and expressive vocabulary skills. (R. at

26-27.) She interacted at age level and was socially appropriate. (R. at 28.) Shannon continued to show improvement in her right-side weakness, and her asthma was controlled with medication. (R. at 28.) Shannon demonstrated age appropriate self-care. (R. at 29.) Lastly, Shannon had difficulty sustaining concentration, but at times was focused, quiet, and attentive. (R. at 29.) Specifically, the ALJ's findings were as follows:

1.     The claimant has not engaged in substantial gainful activity at any time pertinent to this decision.

2.     The claimant has a learning disability and bronchial asthma, which are considered severe.

3.     The claimant's impairments (or combination of impairments) do not meet or medically equal the requirements of a listing in the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4.

4.     Subjective complaints are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of this decision.

5.     The evidence establishes the claimant does not have "marked" or "extreme" limitations in any areas of functioning.

6.     The severity of the claimant's impairments does not functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

7.     The claimant has not been under a "disability" as defined in the Social Security Act at any time through the date of this decision.

(R. at 30-31.)

## IV.   Discussion

Shannon presents six arguments on appeal: (1) the ALJ should reconsider his decision in light of changes to 20 C.F.R. § 416.926a; (2) the Appeals Council erred in denying review; (3)

this case should be remanded to the ALJ for consideration of new and material evidence pursuant to 42 U.S.C. § 405(g); (4) the ALJ erred by disregarding certain evidence; (5) the ALJ erred by not discussing Section 112.02 or Section 112.11 of the Listing of Impairments; and (6) the ALJ's findings that Shannon did not meet Section 112.02 or Section 112.11 of the Listing of Impairments are not supported by substantial evidence. We will address each of these arguments in turn.

### A.    New Regulation for Determining Functional Equivalence

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "Act") made significant changes to the standards used by the Social Security Administration to evaluate childhood disability claims. Prior to the Act, the regulations provided that a child under the age of eighteen was disabled if she suffered from a medically determinable physical or mental impairment of comparable severity to one that would disable an adult. *Hickman v. Apfel*, 187 F.3d 683, 687-88 (7th Cir. 1999); Determining Disability for a Child Under Age 18, 65 Fed. Reg. 54,747, 54,747 (Sept. 11, 2000) (codified at 20 C.F.R. pts. 404, 416). The Act removed the comparable severity requirement and provided that a child was disabled if she had a medically determinable physical or mental impairment that resulted in marked and severe functional limitations and that could be expected to last for twelve months. Determining Disability for a Child Under Age 18, 65 Fed. Reg. at 54,747.

On February 11, 1997, the Social Security Administration published interim final rules implementing certain provisions of the Act. These rules were in effect at the time the ALJ issued his decision in this case, and they were employed by the ALJ to render his decision. (R. at 23.)

Under the interim final rules, if a child had an impairment or combination of impairments that did not meet or was not medically equivalent in severity to a listed impairment, then the administrative law judge was to assess all of the functional limitations caused by the child's impairments to determine if the child's impairments were functionally equivalent in severity to any listed impairment. 20 C.F.R. § 416.926a(a) (1998). If the functional limitations caused by the impairments were the same as the disabling functional limitations caused by a listed impairment, then the child's impairments would be considered equivalent in severity to the listed impairment. *Id.*

One way that administrative law judges could determine functional equivalence under the interim final rules was to evaluate the effects of the child's impairments on five broad areas of development or functioning: cognitive/communicative development, motor development, social development, personal development, and concentration, persistence, or pace. 20 C.F.R. § 416.926a(c)(5)(iii) (1998). An extreme limitation in one area or a marked limitation in two areas directed a finding of functional equivalence. *Id.* § 416.926a(b)(2). Marked limitation meant a valid test score that was two standard deviations or more below the norm for the test when a standardized test was used to measure functional abilities. *Id.* § 416.926a(c)(3)(i)(A). For children from ages three to eighteen, marked limitation also meant more than moderate and less than extreme. *Id.* § 416.926a(c)(3)(i)(C).

The final rules, which went into effect on January 2, 2001, which were applied by the Appeals Council on review, and which the parties agree must be applied by this Court on review, *see Hickman*, 187 F.3d at 688, continue to require two marked limitations or an extreme limitation for purposes of establishing functional equivalence. 20 C.F.R. § 416.926a(a) (2001).

- 12 -

However, instead of evaluating the child's impairments in terms of five broad areas of functioning, the final rules require the administrative law judge to evaluate the child's impairments in terms of six domains: the ability of the child to acquire and use information, to attend and complete tasks, to interact and relate with others, to move about and manipulate objects, to care for oneself, and the child's health and physical well-being. *Id.* § 416.926a(b)(1). Thus, an extreme limitation in one domain or a marked limitation in two domains directs a finding of functional equivalence.

The Social Security Administration designed the domains to provide better guidance on the evaluation of impairments to adjudicators and the public. Compared to the broad areas of functioning, the domains aim to provide more detailed and clearer examples of typical and atypical functioning. For instance, the attending and completing tasks domain states that a child between the ages of six and twelve should be able to sustain her attention well enough to participate in group sports. 20 C.F.R. § 416.926a(h)(2)(iv). In response to public comment, the Social Security Administration disjoined certain components of functioning that were considered together under one of the broad areas of functioning, and it grouped the disjoined components with other components of functioning. The goal was to provide a more accurate assessment of the child's limitations. Determining Disability for a Child Under Age 18, 65 Fed. Reg. at 54,759. For example, the acquiring and using information domain encompasses the broad area of functioning called cognition/communication minus aspects of communication dealing with speech and language used for interacting and relating. These aspects of communication are dealt with in the interacting and relating with others domain, the successor to the broad area of functioning called social functioning. *Id.* at 54,759.

Shannon contends that this change in the regulations from "broad areas" to "domains" requires a remand considering that the ALJ did not consider, and Dr. Fischer did not address, Shannon's ability to function in the acquiring and using information domain, the attending and completing tasks domain, and the caring for oneself domain. (Pl.'s Mem. Supp. Mot. Summ. J. at 9.) To assume now that the ALJ or Dr. Fischer would have reached the same conclusions if either of them had analyzed Shannon's limitations under the relevant domains rather than the broad areas of functioning, Shannon argues, would amount to improper speculation. (Pl.'s Reply Mem. at 4-5.)

It cannot be disputed that a change in the law provides a permissible ground for remand. *Nelson v. Sullivan*, 966 F.2d 363, 367-68 (8th Cir. 1992); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980); *Hicks v. Califano*, 600 F.2d 1048, 1050 (4th Cir. 1979). And, as Shannon indicates, the courts cannot supply alternative grounds to sustain an administrative law judge's decision. *O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir. 1991). Yet it is equally incontestable that remand is unwarranted where a claimant fails to demonstrate that remand might affect the outcome of the case. *Nelson*, 966 F.2d at 367-68; *Warncke*, 619 F.2d at 417. And the courts need not entertain undeveloped and perfunctory arguments no matter what the issue. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (quoting *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998)). In making her argument for remand as a result of the change in law, Shannon neither cites to any pertinent case law nor indicates any change in the law that might affect the ALJ's rationale or Dr. Fischer's opinions. For example, nowhere in this section of her brief does Shannon point to a particular domain, compare and contrast it with a broad area of functioning, and tell us how or why the ALJ's decision might be different under current law. Shannon simply

points out that the law has changed and asks for a remand. Surely, it takes a little more than that to receive such relief.

We have reviewed the pertinent regulations and parts of the federal register ourselves, but find no apparent basis for granting Shannon's request for remand. It is not as if the change in law advanced by Shannon affected the weight of a particular piece of evidence relied on by the ALJ or created some standard that now compels a finding that Shannon is disabled. We note that, in general, the domains are not too different from the broad areas of functioning. *Compare* 20 C.F.R. § 416.926a (1998), *with* 20 C.F.R. § 416.926a (2001). No sea change took place with the coming of the domains. Each domain can be traced to a particular broad area of functioning, or two. Basically, the same criteria apply and the same evidence that was used by administrative law judges in the past to determine a claimant's limitations under one of the broad areas of functioning will be used by administrative law judges in the future to determine a claimant's limitations under one of the domains. In many cases, it appears, the end result should be the same.

We recognize the possibly for differing results. Again, the problem here is that Shannon has failed to sufficiently present any of these possibilities, in relation to her case, to us for review. As a result, we find no basis for remanding the case to the ALJ to reconsider any findings in light of current law.

### B.   Denial of Review

After the ALJ issued his decision, Shannon submitted additional evidence to the Appeals Council from Aunt Martha's Youth Service Center diagnosing Shannon with ADHD. (*See* R. at

274-83.) Shannon argues that this additional evidence constituted new and material evidence under 20 C.F.R. § 416.1470(b) and that the Appeals Council erred by finding the evidence immaterial. Further, Shannon argues that the Appeals Council erred by not adequately explaining its basis for denying full review.

Section 416.1470(b) of Title 20 of the Code of Federal Regulations provides that

[if] new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. . . . [The Appeals Council] will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

We review de novo the correctness of the Appeals Council's findings as to whether the evidence is new, material, and related to the period on or before the date of the administrative law judge's decision. *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997); *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993). But absent any such legal error, the Appeals Council's decision to deny review is discretionary and unreviewable. *Perkins*, 107 F.3d at 1294; *Yousif v. Chater*, 901 F. Supp. 1377, 1382 (N.D. Ill. 1995); *Fugate v. Shalala*, No. 92 C 5358, 1993 U.S. Dist. LEXIS 13683, at *38-39 (N.D. Ill. Sept. 23, 1993).

In its denial letter, the Appeals Council explained that "where new and material evidence is submitted with the request for review, the entire record will be evaluated and review will be granted where the Appeals Council finds that the Administrative Law Judge's actions, findings, or conclusion is contrary to the weight of the evidence currently of record." (R. at 4.) The Appeals Council then stated that it "considered the contentions raised in [Shannon's counsel's] letter dated January 25, 2001, as well as the additional evidence [from Aunt Martha's Youth Service Center]," but "concluded that neither the contentions nor the additional evidence

provide[d] a basis for changing the Administrative Law Judge's decision." (R. at 4.) Although not explicit, we believe that these statements show that the Appeals Council considered Shannon's additional evidence to be material, contrary to Shannon's position. The Appeals Council considers additional evidence pursuant to 20 C.F.R. § 416.1470(b) only after it determines that the evidence is new and material. *Perkins*, 107 F.3d at 1294; *LaPorta v. Apfel*, No. 98 C 5657, 1999 U.S. Dist. LEXIS 12524, at *9 n.1 (N.D. Ill. Aug. 11, 1999); *Fugate*, 1993 U.S. Dist. LEXIS 13683, at *40-41. If the Appeals Council were to find additional evidence to be immaterial, then it would refuse to even consider the evidence in the first place. *Id.* Clearly, this did not happen here as indicated above.

We also reject Shannon's argument that the Appeals Council failed to sufficiently articulate its basis for denying review. The Seventh Circuit has held that "the Appeals Council may deny review of an administrative law judge's decision without articulating its reasons." *Damato v. Sullivan*, 945 F.2d 982, 988 (7th Cir. 1992); *accord Morphew v. Apfel*, No. IP 99-655-C H/G, 2000 WL 682661, at *10 (S.D. Ind. Feb. 15, 2000); *Holloway v. Sullivan*, No. 92 C 3176, 1992 WL 245615, at *2 (N.D. Ill. Sept. 24, 1992). Thus, even if we were to agree with Shannon that the Appeals Council did not articulate its basis for denying review, we would not find that the Appeals Council committed any error.

### C.    Motion for Remand

As an alternative, Shannon asks this Court to remand the case to the ALJ for consideration of the additional evidence from Aunt Martha's Youth Service Center pursuant to 42 U.S.C. § 405(g). Under 42 U.S.C. § 405(g), a court may remand a case to the administrative law

judge for consideration of new and material evidence, provided that the claimant had "good cause" for failing to submit the evidence to the administrative law judge during the prior proceeding. *Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991); *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). New evidence is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding." *Sample*, 999 F.2d at 1144 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). New evidence is material "if there is a 'reasonable possibility' that it would change the outcome" of the final decision. *Nelson v. Bowen*, 855 F.2d 503, 506 (7th Cir. 1988). Finally, at a minimum, a showing of good cause includes some explanation as to why the new evidence was not gathered at the proper time. *Watts v. Harris*, 614 F.2d 515, 516 (1980).

We agree with the Commissioner that Shannon flunks the newness and good cause parts of the § 405(g) test.[3] Shannon's additional evidence is dated from April 1999 through June 1999, while the ALJ hearing took place in August 1999. Shannon claims that the evidence "may not have been available, as a practical matter, at the time of the hearing." (Pl.'s Mot. Remand at 2.) Conjecture of this sort, however, is wholly inadequate to satisfy the burden of showing "newness" under 42 U.S.C. § 405(g). Accordingly, we find that Shannon's additional evidence is not new. In terms of good cause, Shannon provides no explanation other than her amorphous statement that the evidence "may not have been available." This is insufficient for the reason stated above. *See Waite v. Bowen*, 819 F.2d 1356, 1361-62 (7th Cir. 1987). Therefore, Shannon's Motion for Remand is denied.

---

[3] We note that evidence is deemed new under 20 C.F.R. § 416.1470(b) if it was not considered previously during the administrative process. *Delvalle v. Apfel*, 97 F. Supp. 2d 215, 222 (D. Conn. 1999).

## D.     Evidence of Encephalopathy

Shannon next contends that the ALJ committed error by not discussing the 1998 electroencephalogram in his analysis and by rejecting the results of the electroencephalogram without explanation.  Courts have repeatedly stated that administrative law judges have a duty to articulate reasons for accepting or rejecting entire lines of evidence.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984).  A written evaluation of every piece of evidence is not required.  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  Yet administrative law judges may not select and discuss only the evidence that supports their ultimate conclusions.  *Herron*, 19 F.3d at 333.

After reviewing the briefs, the electroencephalogram, and the entire record, we find no basis for remanding the case to the ALJ to discuss any aspect of the electroencephalogram. Dr. Philipps interpreted the electroencephalogram as being "[m]ildly abnormal . . . due to the presence of the mildly diffused slowing of the background rhythm, compatible with encephalopathy."[4]  (R. at 219.)  Encephalopathy is a broad term defined as "any disorder of the brain."  Stedman's Medical Dictionary 588 (27th ed. 2000).  Dr. Philipps's provisional diagnosis was "developmental delay."  (R. at 219.)  The text of the ALJ's decision expressly indicates that this information was relied on by the ALJ to support his conclusion that Shannon was severely impaired due to developmental delays.  (R. at 24.)  So, contrary to Shannon's assertion, this is not a case where evidence was ignored.  We note that Dr. Fischer, whose testimony on which the

---

[4] During the electrocephalogram, Dr. Philipps did not observe areas of focal slowing or epileptic discharges.  (R. at 219.)

ALJ also relied, reviewed the results of the electroencephalogram and Dr. Philipps's interpretation of the test. (R. at 63.)

Nor is this a case where the ALJ rejected a line of evidence without providing adequate explanation. Given the mild results of the electroencephalogram, Dr. Philipps's diagnosis of developmental delay, the ALJ's conclusion that Shannon suffered from developmental delays, and the ALJ's ultimate conclusion that Shannon suffered from limitations caused by developmental delays, it can hardly be said that the ALJ rejected the results of the electroencephalogram or Dr. Philipps's interpretation of it. From what we can tell, the ALJ accepted this evidence along with the other evidence of developmental delays, all of which, as a whole, was adequately discussed by him. Shannon has failed to convince us otherwise. Particularly, Shannon's emphasis on the vague phrase "compatible with encephalopathy," the significance of which is insufficiently explained, appears misplaced. The diagnosis listed on Dr. Philipps's report indicated only developmental delay—a single medical impairment not two.

### E. Failure to Consider Specific Listings

Shannon faults the ALJ for not articulating his analysis of the case under Section 112.02 or Section 112.11 of the Listing of Impairments. *See* 20 C.F.R. ch. III, pt. 404, subpt. P, app. 1, §§ 112.02, .11. Although the ALJ stated in general fashion, after he discussed the evidence, that "the claimant is not subject to any impairment or combination of impairments that meets or medically equals the requirements of the Listing of Impairments," Shannon claims that this is insufficient as a matter of law. (Pl.'s Mem. Supp. Mot. Summ. J. at 12 (citing (R. at 25)).)

A similar argument was rejected in *Waite v. Bowen*, 819 F.2d 1356 (7th Cir. 1987). There, the ALJ stated that "'[t]he medical evidence establishes that the claimant has a loss of motor and sensory function of the left arm, but he does not have an impairment or a combination of impairments listed, or medically equal to one listed in Appendix 1, Subpart P, of Social Security Regulations No. 4.'" *Id.* at 1359. The Seventh Circuit held that the administrative law judge's statement constituted sufficient articulation to show that the ALJ considered the issue of medical equivalence. *Id.* Likewise, we find that the ALJ's statements in this case constitute sufficient articulation to show that he considered whether Shannon's impairments met or equaled Section 112.02 or Section 112.11 of the Listing of Impairments. *See id.*; *Pope v. Shalala*, 998 F.2d 473, 481 (7th Cir. 1993); *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988); *Gressel v. Bowen*, No. 88 C 2519, 1989 WL 6404, at *3-4 (N.D. Ill. Jan. 26, 1989). *But see Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

### F.    Substantial Evidence

Finally, we reach the issue of whether substantial evidence supports the ALJ's findings that Shannon did not meet Section 112.02 or Section 112.11 of the Listing of Impairments. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine whether the ALJ's decision is supported by substantial evidence, "we review the entire record; however, we do not substitute our judgment for that of the [ALJ] by reconsidering facts, reweighing evidence, resolving conflicts in [the]

evidence, or deciding questions of credibility." *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).

Section 112.02 of the Listing of Impairments provides that a child is disabled if she has an organic mental disorder that causes medically documented problems in at least one of ten areas and marked problems in at least two of four areas. 20 C.F.R. ch. III, pt. 404, subpt. P, app. 1, § 112.02. Section 112.11 of the Listing of Impairments provides that a child is disabled if she has attention deficit hyperactivity that causes marked inattention, marked impulsiveness, and marked hyperactivity, as well as marked problems in at least two of the four areas specified in Section 112.02(B)(2). 20 C.F.R. ch. III, pt. 404, subpt. P, app. 1, § 112.11.

Not to mention the fact that Shannon has failed to indicate any evidence that demonstrates the presence of a specific organic factor judged to be etiologically related to her abnormal mental state, as well as the fact that Shannon has failed to indicate any evidence that demonstrates the presence of marked inattention, impulsiveness, and hyperactivity, we find that the ALJ's decision must be affirmed because substantial evidence shows that Shannon is not markedly limited in age-appropriate cognitive/communicative function, social functioning, or personal functioning, or markedly limited in maintaining concentration, persistence, or pace. The ALJ's analysis of each of these criteria is extensive, while Shannon's criticism of the ALJ's analysis is perfunctory. Briefly, we note that Shannon's most recent I.Q. score was eighty-nine. Her speech and language skills showed age appropriate voice and fluency and average receptive and expressive vocabulary skills. As a whole, the evidence shows that Shannon interacted at age level and that she acted socially appropriate. In addition, Shannon could adequately care for herself. At times Shannon was unfocused and inattentive, while at other times Shannon was

focused and attentive.  In short, no one disputes that Shannon experiences difficulties in each of the aforementioned areas.  Nonetheless, substantial evidence demonstrates that Shannon is not markedly limited in any of them.

## V.     <u>Conclusion</u>

For the reasons stated, Shannon's Motion for Summary Judgment and Shannon's Motion for Remand are denied.  The Commissioner's final decision is affirmed.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** April 23, 2002.

Copies have been mailed to:

ROBERT C. KIELIAN, Esq.
M. JACQUELINE WALTHER, Esq.
33 West Jackson Boulevard
Suite 201
Chicago, IL  60604

Attorneys for Plaintiff

JONATHAN C. HAILE
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, IL  60604

Attorney for Defendant